Why don't you wait just a minute so that we clear out the courtroom? Very good. You may proceed. Good morning, Your Honors. Fania Davis of Moore and Moore, representing appellant Luis Murillo. And sitting with me at counsel table is Mr. Howard Moore. Your Honors, the grant of summary judgment should be reversed for three reasons. One, the district court improperly deferred to the arbitrator's decision that the denial of tenure was substantively just. Secondly, the court improperly weighed conflicting evidence and drew inferences favorable to the employer and unfavorable to Professor Murillo at every turn. These two legal errors pervaded and permeated the whole analysis under McDonnell Douglas, so that was tainted as well. But you have a discrimination claim here, and where is the racial animus to be found? You have students who evaluated over a number of years. You have a faculty committee from other institutions who evaluated the research done by Professor Murillo. And then you've got a tenure committee that basically enforced the terms of the collective bargaining agreement. Where is it that the racial animus that underpins a Title VII claim can be found? Yes, Your Honor. Thank you. Well, first of all, the Supreme Court and all of our courts recognize that in the post-segregation era, one is not likely to find a smoking gun of racial animus. For this reason, we don't expect to find direct evidence of racial animus. So it's perfectly fine for a Title VII plaintiff to rest his or her case on circumstantial evidence entirely. And we have strong circumstantial evidence here from which a jury could infer the differential treatment occurred, from which a jury could infer that the decision-maker was not credible. And under Reeves, which applies a pretext-permissive, pretext-only rule, that's sufficient to avoid summary judgment. The question isn't whether a jury would draw the inference of discrimination and differential treatment and lack of credibility by Dean Williams, but whether it could. But you would place it at Dean Williams and the decision-making, ultimately taking the raw material that was submitted to it in the form of substandard teaching evaluations, and an adequate, but not superior, research mechanism. And would argue that, notwithstanding the clear terms of the collective bargaining agreement, a different decision should have been made with regard to Professor Maria? Yes, I would. First of all, I think we have to really set aside the arbitrator's decision. And I think that that is compelled by Alexander v. Denver Gardner, Gardner-Denver. In Alexander v. Gardner-Denver, the Court held that when a contractual claim is decided by an arbitrator, that does not foreclose the decision on a statutory claim in a Title VII court. That you cannot take. No, but I think it informs it in some respects. Go ahead, Judge Kleinfeld. I'm sorry. Go ahead. Counsel, I'm having trouble with the qualified requirement of the Prima Facie case. It looks to me as though this must be an extraordinarily intelligent man. His degrees are very impressive, but his students just don't like his teaching. And he gets these really bad ratings. Now, they may be being unfair, it may be totally unjustified, it may be that they just don't like all the work that he dishes out. But he gets really bad ratings. And it looks like a requirement for tenure is you have to have much better ratings than he gets from the students for teaching. And if that's a qualification, it looks like he doesn't make it. Why isn't that the end of it? Two or three things in response to that. It's not the end of it, first of all, because the evidence needed to satisfy the qualifications prong of the Prima Facie test is minimal. According to Lyons, according to Laborde, these are Ninth Circuit decisions. Secondly, it's very important to understand that even though the collective bargaining agreement says that you have to have at or above average student evaluations in order to get an adequate rating in teaching, and it's conceded that Professor Rio did not have consistently at or above average teaching evaluation quantitative scores. However, Your Honor, what is very critical here is that Dean Williams rated as adequate and granted tenure to three other individuals who had consistently below average quantitative scores, just as Professor Mario did. And for two of those individuals, they had more below average scores than Professor Mario did. Now, let's say we go with you on that for the Prima Facie case. That would bring us over to Judge Layton's question about the racial animus. Let's suppose that we accept your point that the university did a lot of dancing around on what its justification was. It seems as likely that they were discriminating against him because he was a cigarette smoker and they don't like cigarette smokers, as that they were discriminating against him because he was an Afro-Latino, I think he classified himself as. I don't see any evidence that they were discriminating against him because he was an Afro-Latino. Your Honor, first of all, let me go back a little bit and elaborate a little bit more on the qualified question, and then I will definitely answer your question because that's a critical question, obviously. But on the question of qualifications, the Ninth Circuit in Lyon and in La Borde decided that minimum qualifications are needed for circumstantial evidence of qualifications. In this case, we had 16 members of the peer review committees at the business level, business school level, and at the university level who decided that he was qualified in the areas of teaching, service, and research. Thirteen found him superior in research and three adequate. Fourteen found him adequate in teaching and two inadequate. Sixteen, all of them found that he was superior in service. So he's clearly qualified, plus we have sworn statements from two former deans saying that they know individuals less qualified than he in the area of teaching and in the area of scholarship who have been granted tenure previously by the business school. So, now to your question. The Supreme Court in the Leaves stated that in order to show context, in order to rebut the facial or mutual reasons proffered by the employee for the adverse action, that a plaintiff can, one, show that the decision-maker was not credible, that the reasons offered for the denial of tenure are not credible. And here we have such evidence, I submit. We have strong evidence because Dean Williams said that the reason, Professor Maria, that you are not going to get tenure is because you have below average student ratings and this is an automatic disqualifier for tenure. However, that is belied by the fact that he granted tenure to three other people who had below average teaching quantitative scores. So that is simply not credible. Now, as to the question of research, the dean said, well, Professor Maria, you're not entitled to tenure. We have independent evidence to this effect. We have outside reviewers who agree with me that your research is really substandard. It's only adequate. It's not superior. So, how does plaintiff overcome that? And it's not really, I have to say, a matter of overcoming this evidence. It's only creating a trialable issue. It's only creating, only providing evidence from which a jury could infer that discrimination occurred. And here, with the outside reviewers, there's some real problems. The biggest one is that Dean Williams withheld from the outside reviewers, Professor Maria's major publication, his major publication, 2,000 pages of heavily researched, heavily cross-referenced, which granted accolades and praise from leading scholars and statesmen, even President Bush, not that he's a scholar, but from leading scholars from all over the country. He spent years, this was his creative magnum opus, but Dean Williams refused to give it to the outside reviewers. A jury could infer from that alone that Dean Williams was trying to set up Professor Maria, was trying to predetermine the outcome of the outside reviews. Because- How would you deal with the same actor issue then? Dean Williams hired Professor Maria earlier. There's case law in California and elsewhere, including this circuit, that there's a strong inference arises that there was no discrimination where the individual who terminated the subject, the plaintiff or appellant, was also the person who hired him. The inference being that race was not an impediment to being hired. It is unlikely that it was a motivator for the firing. Sure. The inference, as we all know, is rebuttable. And Ninth Circuit holds that the inference can be rebutted by the passage of time. Here we have seven years. And more importantly, the inference is rebutted because Dean Williams- Why does passage of time rebut the inference in this instance? Why does it? Yes. You can't just say- That's a good question. But I just know that the cases hold that if it occurs like a year later, then it's really not likely that the same person who hired this person a year before is firing him because of discrimination. And I can't tell you offhand what the rationale of the California courts are and the Ninth Circuit is on that point. But I know that the cases hold that the longer the time passes, the lesser, the weaker the inference. But the other, and this is the more important thing, who was not the decision maker in the hiring? If you look at the hiring letter, it was father, his name escapes me right now, but the provost. It was not Dean Williams. Not only that, but in universities, typically, there's a whole process that the hiring goes through at various tiers, various levels. And there are multiple actors who make the decision or who have input in the decision. But here, it was the provost who made the final decision based on the recommendations of a number of people below. There is evidence from which the jury can infer, and there's clear evidence, that Dean Williams did not want to hire him. But the business faculty revolted and insisted they wanted him. So he went along- Did Dean Williams give him a glowing recommendation early on when the professor was in the hiring process? Didn't Dean Williams give him a very influential recommendation that led to his hiring? Dean Williams says that. But the members of the hiring committee, Professor Mefford, who was the chair of the search committee, differs. So there is a competing inference that's possible. And whenever there are competing inferences on a motion for summary judgment, the reviewing court must draw the inference that favors the non-move-on. There was a problem here at every step of the way on the outside review, and this is very important, the comparative tables. I've attached all of the tables. We've got a table A and we've got a series of B tables, which is not just pulled out of thin air. These tables represent thousands of pages of documents coming from the tenure files of comparators, of seven comparators. We fought for a whole year to get this evidence. There was a discovery battle. And we finally got it. And because the evidence was so voluminous, we had our experts compile the evidence and put it into table form. But the tables show, Your Honors, excuse me, the tables clearly show differential treatment. I've already discussed the tables concerning teaching, how they show that three other individuals had at or below average teaching ratings, yet they were rated adequate and granted tenure. Now, the court, instead of drawing the inference that this could be evidence from which a jury could find differential treatment and a lack of credibility by Dean Williams, what does she say? She'd say, oh, this table is not reliable. This table doesn't is very weak because it doesn't really say how far below the mean each of those persons fell in respect to Professor Murillo. So she's drawing all of these competing inferences from the table, which are possible. As I recall, the others didn't really meet the scores they should have had to get tenure, but he fell way below them. Is that true? No, no, I don't think that's true. There is some evidence to that effect, and that's certainly what the university argues. But there is there is evidence in the record that that that contradicts that. And the most that they gave tenure, it's their evidence that they gave tenure to people whose scores were in the same range as his. Absolutely. Absolutely. Absolutely. It looked to me like his students hated him because he made them work too hard. That's what he thinks, too. Yes. What does he teach? Incidentally, what subjects? He teaches international business and management. And he was a rocket scientist before he came to USF. Literally, he was had a Ph.D. in aerospace engineering. But back to the tables. I want I want to I know we have five minutes left and I'd like to save some time for rebuttal. Actually, I want to go back to the outside reviews, because that's, I think, an important point. You will find in the record one of the outside reviewers who said, I'm puzzled. Why didn't Dean Williams give me this man's book? You know, I only have his articles. It would be it would not be hard to convince me. This review from Santa Clara University said that one book, if it's well done, is worth ten or a dozen journal articles. He said further, I just don't understand why this book was not provided to me. You know, I would have gone out to get it, but I got the impression that it was deliberately excluded from these materials. So I don't I did not review it. I think that's that evidence damns Dan Williams credibility. He claims what does he claim that he did not give them the book? He says, oh, we only had one copy. And I asked them if they wanted one. We could give it to him. But in the bottom line is that none of them got the book. And then he said in his deposition, when asked, well, why didn't you think very much of this book? Why didn't you read it? Why didn't you credit it? He says, well, I didn't really give it very much weight. I didn't think it was that important. This 1000 page major creative scholarly work. I didn't think it was very relevant because it was outside of his field. That was the reason he gave for giving such little weight to this magnum opus. By the way, it was this book that led the peer review committees to grant him superior. They were so impressed by this book. And they said that this book alone would be enough for a superior reading and tenure at USF. But it was not included. Now, let me ask you a slightly different question, because I understand your argument on that. But at the end of the day, if this case goes back to district court and you stand in front of the jury and they answer the question, we know that these actions were taken because of racial animus, because how would you how would you complete the sentence? OK, thank you for getting me back, because that was a question that Judge Kleinfeld asked me a little bit earlier. And I told him I was going to get back to it. And it doesn't look like I really did the racial animus. Or maybe that was a question that you asked me, Justice Layden. As I said earlier, the Supreme Court recognized that you don't have to have direct evidence. You don't have to have a smoking gun. Circumstantial evidence is enough. So what is circumstantial evidence? What is what kind of circumstantial evidence is enough to show racial animus under the title under the Civil Rights Act? Well, differential treatment. Number one on the list. Differential treatment. The decision maker applied temper standards, a different set of standards to Professor Murillo, to his disadvantage. My question is, we I've read your brief and the record on those issues. Yes. You already went on pretext. Yes. But pretext can be used for to mask a whole lot of different maybe you simply didn't like your client. Maybe there's something else going on. What in the record is your best evidence that it was racial animus as opposed to any other kind of animus? Well, Reeve says that if the decision maker is lying, then that is enough to infer that the real reason may be discrimination. I can't look into Dean Williams' head and say, oh, yeah, I see a light called racial animus going off. The Supreme Court recognizes that. I understand that. But when you are in front of the jury, you're going to have to say something besides you can draw these inferences. You have to say, well, you didn't like rocket scientists. You didn't like anybody. Why do we know it's race? Because he treated him differently. And because of reasons that he treated him differently, do not hold up. I will read it differently from who I mean. I mean, yes. One thing that would occur to me in this case right away is maybe they don't like him because they think he's smarter than them. He's got tremendously impressive degrees for USF professor. It seems like any other inference. That's why I mentioned cigarette smokers. Any other inference seems as likely as racial animus since they hired plenty of other Latino professors and gave him tenure and they hired him. But I'm not required to give the reasons why they do not. You're not required. You're not willing to require a pretext, pretext. You're right on the law about pretext, leaving open the possibility. But all three of us are trying to find out why should we believe, even if the university is lying, that the real reason is ethnicity as opposed to anything else? Well, this is a question that the jury would have to decide. This is a question that must be decided based on the totality of the evidence. And I submit that there is substantial and specific evidence on the issue of pretext. And that is sufficient to defeat summary judgment. The question of whether race is a factor in the decision making is one for the jury alone. There is enough here based on the differential treatment, based on the lies about the outside reviews, based upon the lies about the reasons for giving him an adequate rating in teaching. There is enough here for this to go to a jury. And to rule otherwise, I think, would be to basically say that a judge gets to make these determinations, the Title VII plaintiff's determinations. Thank you, counsel. You're over your time, but we'll give you a few minutes for rebuttal. Thank you very much. Good morning, Your Honors, and may it please the Court. My name is Jonathan Martin, and I represent the University of San Francisco. I want to start by responding to some of the arguments that the professor's counsel has made today. First, in connection with the U.S. Supreme Court decision in the Reeves case. Ms. Davis only told you part of the story as to what the Reeves court said. Yes, the Reeves court did say that evidence in support of a prima facie case, plus evidence that the employer lied about its reasons for its adverse action, may be enough to support an argument of pretext. That's the key word, may be enough. The Reeves court went on to say that there may be instances, and we believe that this is one of those instances, where the record conclusively reveals either some other non-discriminatory reason for the employer's action, or, as we believe is true here, the plaintiff creates at most only a weak issue of fact as to whether the employer's reason was untrue, and there's abundant and uncontroverted evidence that no discrimination had occurred. So, in other words, the Reeves court is still requiring that there be some evidence from which a rational jury could conclude that, yes, Your Honor. Have they hired other professors and then given them tenure who had teaching ratings comparable to his? I don't believe so, Your Honor, and I'm just going to restrict myself to the record here, and I'd be happy to actually address that point because I know Ms. Davis talked about other professors who supposedly had teaching scores that were comparable to the professor's. Let's take a look at that. What the appellant's expert did is not look at the collective bargaining agreement standard. He made up his own standard. He said, we're going to count up just the number of scores below the average that each of these comparators received. That's not the standard under the collective bargaining agreement. Under the collective bargaining agreement, to receive an adequate in teaching, the teaching scores have to be consistently at or above the average for the school. And for a superior rating in teaching, the scores have to be consistently, significantly above the average for the school. So the question is, did the appellant's expert look at whether the comparator scores were consistent? No, they just looked at the actual numbers. So what that allows for is for them to conclude that, well, let me try it this way. The word consistent is a vague term in this context. So given the fact, I mean, there's no measure of consistency that I could see. There's no mathematical measure of consistency. So the plaintiff's expert says he satisfied the standards or these other people were in his scoring range. So given that, why shouldn't we draw the inference in their favor at summary judgment, if we're down to inference? Well, where is the evidence that those other professors are similarly situated? Where are those professors' scores?  As Dean Williams indicated in his evaluations of all the other professors, with all the other professors, at least in the years immediately preceding the decision on tenure, those professors' scores were at or above the average for the school. So maybe they started off early on with a lot of scores below the average, but they improved to the point where on a consistent basis in the years prior to the tenure decision, they had reached the level of at or above the average for the school. The appellant's expert didn't perform that analysis at all. And that's where the difference lies. It seems to me, the toughest issue you have is if we get to pretext, the plaintiff does have a few issues. This is one in which it comes down to inference, that there is a genuine issue. There may be a genuine issue of material fact on this issue. And if we have to draw inferences, we have to draw them in favor of the plaintiff at this stage, right? Well, that, of course, you're vigorously and probably, you may well be accurately saying, well, there's a difference. The plaintiff has, the plaintiff's expert has construed the scores this way. We don't think that's fair. But at this stage, why shouldn't we take the plaintiff's expert's view? Well, I understand that the court has to resolve the inferences in favor of the non-moving party. But I don't think that means that you completely disregard the standards under which the professor was supposed to be judged. But in that context, I understand that the arbitrator's decision is not binding on the issue of discrimination, certainly. But is it, if this case were to be sent back to the trial court, is the arbitrator's decision binding on the issue of Professor Morello's qualifications under the collective bargaining agreement? I believe that it should be, because it's the arbitrator that has the sole and exclusive jurisdiction to decide issues that arise under the contract. And whether Professor Morello met the standards for tenure is entirely a creature of contract. It's decided entirely by the collective bargaining agreement. So at least on the issue of whether he was qualified, yes, I believe that the arbitrator's decision should be given a conclusive effect. Now, I understand that that may make the appellant's case that much harder. But again, it's the arbitrator who decides whether the contract was breached here. And again, whether he met the standard is entirely an issue of whether he satisfied the standards under the contract. And the arbitrator does have the sole and exclusive discretion to draw that conclusion. I want to get back to some of the other issues that my adversary made. They argue that Dean Williams refused to give Professor Morello's book to the outside reviewers. And that's just not true. The evidence shows that he discussed the issue with the three outside reviewers. One of them said that he would try to find it at his own library. The other one said that he would try to find it at his own library. And if he wasn't able to find it, he'd contact Dean Williams. And the third professor said he probably wouldn't read it because it was outside his field. So to the extent that they're claiming that Dean Williams deliberately withheld the book, that's just not the case. Well, but didn't the Santa Clara reviewer say that he or she regretted that the Noriega mass, the book, had not been sent and did not seek to find it because I assumed that it had been left out deliberately? That professor also at the conclusion said that he or she would rate Professor Morello in comparison to junior scholars in other fields at the bottom 30 percent. I think regarding the issue about the reviewer speculating as to why the book wasn't sent, I believe that's just that, speculation. And I think the reviewer said in his or her review that, or suggested anyway, that the reason why Dean Williams may have left it out is because it was outside Professor Morello's regular business field. Again, that was only speculation on his part as well. And whether that was a, assuming that that even was Dean Williams's thinking, there's no evidence that that means that there is a bias against the professor on the basis of his race or national origin. How did Dean Williams know in advance that that's what this reviewer was going to say? How does he know? Because he was supposed to be reviewing the research. I mean, this is your research and publications. So, I mean, the whole idea is, of course, you're not going to have, at least in this case, well, many cases, I should say, of course. But you don't have in this case any direct evidence of discrimination. That's clear from the record. So it's all inferential. And if Dean Williams had sent all the materials to reviewers, if there was agreement that everything had been scored correctly and his work was substandard, you'd have an overwhelming argument. But if we get down to inferences, we have to draw them the other way. So you've made an effective argument about why it might not have been necessary, but one might draw the inference that the material wasn't provided because the dean wanted the scores to be lower. Well, and again, that gets back to the point that was previously made, which is that even if that's the case, where is the evidence that it's because of his national origin or his race or his skin color? There's simply no evidence of that. Have they hired and have they given tenure to other Afro-Latinos? I don't know the answer to that, quite frankly. What I can tell you is that, and it is in the record, that the university has hired or given tenure to professors of many different races and nationalities, and they've also denied tenure to professors of many different races or nationalities. In the record, I don't believe there's any indication that there has been anyone given tenure who is specifically Afro-Latino or Panamanian. That's what's in the record. I want to make another point in response to something that my adversary said. She indicated that Dean Williams didn't hire Professor Murillo. Well, we do know, and it's in the appellant's excerpts of record at page 227, we know that Dean Williams' recommendation was a substantial factor in causing Professor Murillo to be hired. The letter even says, upon the recommendation of the dean. Now, that's not to say that other people didn't have involvement in this decision, but certainly it does mean that Dean Williams was very much in favor of Professor Murillo being hired, and this takes us to the same actor inference that came up earlier. Where is there any evidence in the record that, whether it's a seven-year period or a two-year period, whatever period it is, that on the one hand, when he hired him, Dean Williams was supportive of Professor Murillo because of his race or national origin, wanted to increase diversity at the university. Where's the evidence that seven years later, all that thinking went out the window and Dean Williams decided that diversity wasn't important anymore, that his national origin was now going to be a hindrance rather than a positive factor? There's just no evidence that Dean Williams changed his opinion on that point in any way. And that's why I think the same actor inference is so particularly compelling here, especially because his national origin was considered as a positive upon hire. So where's the evidence that he would have done a complete 180-degree turn and decided that that was going to be the determining factor in the decision to deny him tenure? There's just no evidence that he made that kind of reversal of his opinion. Is there any evidence that he was shoved down Dean Williams' throat by other people? I mean, it's possible Dean Williams would send him a glowing letter inviting him to come work for him, even though he'd opposed him and other people had shoved him down Dean Williams' throat. Well, the evidence in the record is that Dean Williams wanted to hire Professor Murillo, in large part, to increase the diversity at the university. Whether there's evidence that it was shoved down his throat by others, I just can't answer that. There's no evidence in the record. All I have is what I'm asking. Yes, there is no evidence. That's what I'm asking. Oh, okay. I know of no evidence in the record that indicates that this hire was shoved down his throat in any way. I just don't know of any evidence in the record that suggests that. I also want to address the issue of the peer review committees. Ultimately, this case obviously is about a tenure decision, and tenure decisions involve considerations regarding academic, scholastic matters that reasonable people can disagree about. And even the appellant's witnesses agreed with that. They said reasonable people could decide that Professor Murillo's research was merely adequate. So the difficulty here is looking beneath that and trying to find any evidence to defeat that this is just an academic difference of opinion. The bottom line is that the peer committees are merely advisory in nature. They don't represent the decision of the university. So the fact that the majority of the committee members may have been supportive of Professor Murillo's candidacy is not ‑‑ it's not a factor here. They were advisory, that's all. And I would also point out that there were even members of those committees that were not in favor of him receiving tenure. For example, if you look at the college-wide peer review committee, two out of the five members of that committee thought that his research was merely adequate. So why is it that when the university agrees with that peer opinion, they're bigots? The university's opinion was these peers agreed with the university on that point. So it's not as if the university took an overwhelming mountain of evidence of unanimous support for Professor Murillo and threw all of that out the window and decided, well, we're just going to do something completely different. There was some peer support for the university's decision. And then in terms of the teaching issue, the head of the college-wide committee, Professor Huxley, admitted that all five members of that committee unanimously agreed that Professor Murillo's teaching was below average. Well, under the terms of the collective bargaining agreement, that means that they should have voted him inadequate on teaching, and that means that they shouldn't have recommended that he move forward for tenure. But for whatever reason, they decided that his teaching record was adequate, and they moved him forward. I can only speculate as to why they did that, but that's what they did. And then in terms of the research, if only one of the three people who voted him superior had switched over to adequate, then they would have had to decline to recommend him on that basis as well. So this was a very close vote in the college-wide peer review committee. I just point that out because, like I said before, it means that reasonable people could differ here as to whether he was qualified for tenure. It was, at least in the mind of some people, a close decision. And it's one of those academic decisions that I think courts and juries just aren't going to be in a position to reverse absent. Counsel, am I correct that on the teaching score, what that means basically is what the students said about him in their course questionnaires? That's correct. When I refer to teaching scores or teaching evaluations, that is specifically what I'm referring to, yes. So if he's actually a brilliant professor and a great teacher, but these are people that work during the day and they go to school at night or they work part-time and go to school part-time and he just dishes out more work than they can do, and so they give him awful scores, that means no tenure? Well, potentially, yes. And that, of course, is a risk inherent in the use of these student teaching evaluations. But I would point out that this system that they used was required by the collective bargaining agreement. There's no evidence that it was applied differently to Professor Murillo as compared to other candidates. It's the one that they have. And, yes, there is evidence in the record that there was some dispute over the efficacy of these reports. But it's the one they had and they had to use it. Otherwise, the university would be in violation of the collective bargaining agreement. I also want to address some of Professor Murillo's arguments against how the district court made the decision to grant summary judgment. He launches numerous attacks on the court's basic competence, it seems to me, in handling summary judgment motions. Rule 56 indicates that summary judgment should be granted when there's no genuine issue of material fact. Now, the use of the terms genuine and material requires the district court to make some kind of threshold determination as to the sufficiency of the plaintiff's evidence for the purposes of defeating a summary judgment motion. So the court's job is to decide that perhaps certain facts that a plaintiff may present just aren't enough to create an issue either of or of a prima facie case of discrimination or of pretext. It sounds to me what the appellate wants is that as long as he presents someone who agrees with him that he was qualified for tenure, and then as long as he presents an expert who, regardless of his methodology, whether it's sound or not, takes a position that supports his stance, then the district court has to throw up his hands, throw up its hands, and let it all in. And that's just not the rule. The district court does have to make a threshold determination. But isn't the appellant's strongest argument that although under the evaluative criteria, Professor Murillo would be rated not qualified for tenure, the university took others who would be similarly unqualified and did, in fact, grant them tenure, and that the difference in treatment was a result of race? Well, that's certainly their argument. Whether it's their best one, I don't know if I can really say that. Well, but it's the argument that you don't have a case or a factual basis to swat down. Right. That's certainly their underlying argument. And, again, I would look at all the facts that we've seen in this case, the fact that the arbitrator determined that he wasn't qualified. Well, see, that's what you're asking us to weigh in. I mean, that's the hard part about your side of the case is that you take the fact that the similarly situated people, if we draw the inferences in their favor, were treated differently. So you start with that, and then you pile on some other inferences that may have enough to create a genuine issue of maturity. Well, I would ask whether the ---- I'm not saying they do. I'm just saying that's their argument that you have to address squarely. Well, I would ask whether the court or whether the appellant really has made a showing that the other professors were truly similarly situated. Again, in terms of the teaching, it's not an issue of the number of scores below the average. It's the issue of whether they were consistent. Do we have any kind of chart or graph or anything that shows how the ---- Or do you have a definition of consistency that would allow us to make that methodological determination? I don't see that in the record. Well ---- Because I see it as an eye of the beholder, I think. It may well be, but let's at least ---- Under the policy. I mean, I just don't see it. Maybe there is one here. Well, I would say let's at least look at what the progression of improvement in the other professors' teaching scores was, if there was, compared to Professor Murillo. Right. How does that say that anywhere, that the progression is important? Well, I think, first of all, some of the appellant's witnesses indicated that that's what they looked at. And then in terms of the use of the word consistent, you're right, it's not entirely clear what that means. But I think the argument could certainly be made that it's not just the number, it's how it ---- how those numbers progressed over time. Sure. I understand that. Thank you. Your time has expired unless there are further questions. Okay. Thank you. I'll give you two minutes for a bottle. This was the first time that an African, a person of African ancestry, was ever granted a tenure-track position. This is the first time that a Latino was ever granted a tenure-track position. To this day, no African-derived person or no Latino, no brown-skinned person, has ever been granted tenure at the business school. At the business school. Correct. Other places at USF, but not at the business school. That's correct. And there are ---- there was a reference to many different races and nationalities. There are Asians who are represented in fairly substantial numbers within the school of business. And there is a Latino ---- excuse me, an Hispanic, but he is a European. He is a Caucasian, not an African-derived individual. This is the first time that Dean Williams ever rejected the favorable recommendation of the peer review committees below. And it wasn't a close case when you look together at those votes. As I said earlier, it was 16 for superior in service. It was 13 for superior in research. It was 14 for adequate in teaching. There is no evidence in the record that Dean Williams refused to tenure him because he didn't like him, because he was a rocket scientist, because he was a smoker. There's no evidence in the record. That was hypothetical. Yeah. But in other words, there's just ---- None of us seriously believe that he was a rocket scientist. Right. But how can we draw that? That's not a reasonable inference from the record. How do we know that it was race? That was the central ---- Well, we don't know for sure. We should let a jury decide. We should let a jury decide that. We know that ---- We have to give a jury on it. There is substantial evidence and specific evidence under the Godwin standard. Let's say the jury thinks, okay, we don't believe a thing the university says. Give me some smidgen that it's race. The biggest, I think the most important element that we have here is that there was differential treatment. Different standards were applied to Professor Murillo than were applied to others not in his protected class. The others, Hispanic and European, the others, two Asians. In the area of research, even though he should have ranked superior, if you look at the table, the series of tables, table B, he had one book, one book chapter, five peer-reviewed articles in A- and B-plus journals. So there's quality, not just quantity here. There's over 150 articles in the newspapers and op-ed letters. There's nine conference presentations or proceedings and 14 conference presentations. That ranks him at the very top of the persons who were up for tenure at the same time Professor Murillo was. And then when you add his book, he should have been granted, he should have been rated superior. So he was treated differently. Those other individuals who had fewer publications than he did and whose publications were not necessarily qualitatively better than his were granted tenure. So if you treat a person of another race differently from Professor Murillo, then I think that a jury can draw the reasonable inference that this occurred because of his race or because of his color. And again, I can't look into Dean Williams' mind. He may become a jury, but that's the way these cases are these days. A plaintiff should not be penalized for not having any direct evidence. And back to these tables. I think these tables really do meet the standards set forth in Godwin of specific and substantial. And I said earlier, they're not pulled from the thin air. They're not metaphysical. They're not subjective. They're based on thousands of pages of documents that were compiled by our experts. Now, on the arbitrator's decision, that decision is not binding. I talk about Alexander. The last five pages of Alexander v. Gardner, Denver, is dedicated to explaining why deferring to an arbitrator's decision is not appropriate, is not lawful. So one cannot defer to the arbitrator's decision on the question of qualification. It's very clearly set forth. And even though Gardner, Denver has been chiseled away at in the intervening years, the last 32 years, that deferral rule remains intact. The no deferral rule remains intact. The other thing about the tables, there is presently no response to these tables. Those tables stand unrebutted in the record. Those tables which show that plaintiff was just as qualified as the ones who were granted tenure at the same time that he was. They are unrebutted in the record. The defendants poke at the table saying, oh, the experts weren't properly disclosed. Oh, the data wasn't attached. But we got the data from them. We struggled a whole year to get the data. They have all the data. That's where we got the data from. The experts were disclosed properly. So these tables stand. They have not fallen. They stand, as I would say, fairly monumental evidence of deferential treatment, which under canisters is enough to establish certainly an inference of discrimination. So there's enough based on the fact that he has met his prima facie case, the fact that we have submitted evidence, specific and substantial, ample evidence of pretext, ample evidence that Dean Williams was lying. That is enough under rings for the case to go to a jury. Just one final point on the outside reviews, on the book. I said earlier, I believe, that Dean Williams said that he didn't really think much of the book because it was not in Professor Murillo's field. However, around the same time frame, he accepted poetry from a business candidate, business school candidate. And that poetry tipped the scale from adequate to superior in her promotion rating. And so she was allowed to be promoted based on poetry. Thank you so much. Thank you very much for your argument. The case you just heard will be submitted. We have other cases that were listed on the oral argument calendar, but those have either been continued or submitted on the briefs, and we will be in recess. For those of you who are attending from the class, why don't you stay around? We'll be back in touch with you in about 15 to 20 minutes. So if you want to stay around the courtroom, we'll come back and chat with you a little bit. All right.
judges: Kleinfeld, Thomas, Leighton